Your Honor, Kerry Sandman and Kevin Lurch, my co-counsel for Mr. Lopez. Your Honor, Bob Gorman, State of Arizona for the Appalachians. Okay. Counsel. May it please the Court and Counsel. In April of 1990, an Arizona jury convicted appellant George Lopez of child abuse felony murder of his one-year-old son. The Arizona trial court sentenced Mr. Lopez to death. This appeal follows a decision by the Arizona District Court after that court denied Mr. Lopez's application for writ of habeas corpus. The District Court certified a single issue for this appeal, whether Lopez was denied his rights under the Eighth and Fourteenth Amendments when the sentencing court failed to consider and give effect to mitigation evidence presented at sentencing. We believe that the outcome of this appeal issue, when measured under the standards imposed by the AEDPA, must be favorably determined for Lopez based on the Arizona Supreme Court's failure to afford him the meaningful appellate review that the Eighth Amendment requires. As we know, the Arizona Supreme Court affirmed Mr. Lopez's sentence to death by a bare 3-2 majority. Two of the judges refused to affirm the death sentence because they were uncertain what mitigation the trial court had considered and they believed they could not conduct the meaningful appellate review that the Constitution requires. Therefore, we focus on the decision of the three-judge majority made in the Arizona Supreme Court. The majority affirmed the death sentence by adopting nonexistent findings of the trial court, number one, that the trial court found no mitigation, and number two, that the trial court could have found the mitigation evidence proffered by Lopez had been refuted. In fact, both these findings are unsustained by the record and much of Lopez's mitigation had not been refuted. These Arizona Supreme Court findings were, in the parlance of AEDPA, or AEDPA, I should say, objectively unreasonable under 28 U.S.C. 2254 D.2 and resulted in a decision that was contrary to the United States Supreme Court's Eighth Amendment jurisprudence under Eddings v. Oklahoma and Parker v. Duggar. The record reveals a striking amount of mitigation that was never refuted. At sentencing, trial counsel presented undisputed evidence that Lopez would be a positive force for good within the prison system. During his time in the prison setting, he was concentrated on helping others, including disabled prisoners, and the evidence was that he would continue to perform in that fashion or behave in that fashion during his incarceration. Evidence was presented that these same caring traits were observed in Lopez prior to his incarceration in the prison setting, demonstrating that his was not a jailhouse conversion, but rather his incarceration behavior was merely an extension of his pre-arrest character and his desire to help others. According to the United States Supreme Court decision in Skipper v. South Carolina, Lopez's conduct in prison confirming he was not a risk to others and that he placed a high premium on improving himself and helping fellow inmates, quote, unquestionably goes to a feature of the defendant's character that is highly relevant to the sentencing determination, close quote. Lopez presented evidence that his honorable service in the United States military, his strong family ties to his seven younger brothers and sisters whom he helped raise, his exemplary employment history, his years of charitable service to the community, none of this evidence was ever contradicted or refuted by any evidence in the record. The Arizona Supreme Court finding that Lopez's mitigation evidence could have been, the trial court could have found that the mitigation evidence presented by Lopez had been refuted on this record demonstrates that the Arizona Supreme Court based its decision on an unreasonable determination of facts in light of the evidence actually presented in the state court proceedings. There is no record support for this fact finding and therefore the fact finding is objectively unreasonable under ADPUT section 28-2254-D2 and there's no obstacle to this court's federal review. In this case, objectively unreasonable fact finding resulted in a decision that was contrary to clearly established law under 28 U.S.C. 24, excuse me, 2254-D1. The Arizona Supreme Court's objectively unreasonable decision that Lopez proffered mitigation had been refuted when in fact it had not been refuted is simply another way of saying that the unrefuted evidence of mitigation in this record would not be considered and that is the very practice that the Supreme Court held constitutionally infirm in Eddings and Parker. I believe on that basis. Let me ask you to pause here. I'm looking at the Arizona Supreme Court's decision. I want to make sure I have in mind the same portion that you have in mind. Can you point me specifically to what determination of fact you identified as being unreasonable under the APTA standard? I believe, Your Honor, this would be at 847P2-1092. It's in the group of head notes 38-40.  We believe the trial court could properly find that the record refuted the proffered mitigating circumstances. And in this decision, and I should add that two of the justices weren't willing to take that leap of faith and they refused to join in affirming this death sentence. But the three who did affirm the death sentence stated that the trial court could find, could properly find that the record refuted the proffered mitigating circumstances. The court, the three judges who affirmed the sentence were very careful in going over every little piece of aggravating evidence that had been submitted and saying, well, we agree with all that. When it came to the mitigating side of the scale, they had assumed that the trial court found no mitigation and they found, I think clearly, without any record support, that the trial court could find the proffered mitigation refuted. And that's just not possible. I'm not sure I read it in quite the same way. The trial judge further stated, quote, the court finds no mitigating factors as set forth in 13703G. The court has considered all evidence presented by the defendant in way of mitigation, close quote. And it goes on to talk about the good parent part. I don't know that I read this as saying there is zero on the side of defendant by way of mitigation. So much as it says we believe the trial court could properly find that the record refuted the proffered mitigating circumstances such that the appropriate penalty is the penalty that was imposed by the trial court. Because in the end, it's a weighing process. If this really said there is nothing in the way of mitigation or nothing that speaks in favor of defendant, I might understand where you're coming from. But I'm not sure that I read it in quite the same way. Why should we take this as being, in effect, a conclusion that there is nothing that favors defendant whatsoever? And I say that because I think you have to, in order to go on to the next point, that that conclusion is untenable. I'm really trying to figure out what is it about the circumstances here that make this conclusion objectively unreasonable. Well, I'm looking at the plain language that the court used. And the court stated, in as clear terms as I think that they could make it, that the trial court could properly find the record refuted the proffered mitigating circumstances. And the three judges who wrote that started from the assumption, which they state earlier in their opinion, that the trial court found no mitigation. So it's not a very broad leap from making the statement. Well, it says found no mitigating factors as set forth in 13703G. I mean, the trial court also said considered all the evidence presented by the defendant by way of mitigation. There's no question but the defendant submitted evidence by way of mitigation. The question is whether it was sufficiently persuasive to cause the trial court to conclude that any of the mitigating factors listed in the statute or any of the non-statutory factors is a conclusion to be reached that weighs in favor of defendant on some specific element. And I guess, Your Honor, I was also looking at page 136 or, excuse me, 137 of the opinion. That's P2-1084, where the court says the trial court found no mitigating circumstances, period, without reference to subsection G or any other limitation. They simply say that none were found. So it doesn't seem to me there's a very long leap between saying that the trial court found none, which is another issue in the case with respect to how the trial court can make that finding. It's not a broad leap from the fact that they believe the trial court had done that to the three judges on the eras of the Supreme Court, saying that they believe the same and that it had been refuted. And that's the record that we're dealing with, and that this Court has to contend with. And so I think that we can take the leap of faith that the three judges took in this case. And I think that what they took when they signed on to this opinion was mistaken. And I think that Mr. Lopez has demonstrated, even under the most stringent standards in the AEDPA, that he's deserving of a new sentencing. I would say also, Judge, that, you know, when the Supreme Court has looked at these cases, they have looked at the language used by the appellate court. They did that in Eddings. I read the dissent, again, in Eddings, because I find sometimes the dissent is informative of what the majority was doing. But the dissent in Eddings argued, you know, that the court in Oklahoma had read or had examined, they said they examined the entire record, which, of course, included, you know, all the information about Eddings' troubled childhood. And the court, the majority said, well, that's, you know, we know they may have looked at it, but did they consider it? And they looked at the language of the appellate opinion. The same thing in Parker v. Duggar. The court understood that Florida, you know, the dissent there, again, said, well, the Florida appellate court obviously reviewed everything, and we have nothing, we ought to have nothing to say about that. But the majority said, well, let's look at what the Florida Supreme Court did and what they said in their opinion. And so I believe that we've demonstrated Mr. Lopez' right to relief on that ground. I would like to turn some attention to another issue that was not certified. Just before you do, to succeed on that issue, must we be convinced of two things? One, that the trial court, in fact, did not consider all the mitigating evidence? And two, despite that fact, the Supreme Court said that it had? Well, I don't think that you need to make a finding with respect to the fact that the Supreme Court said that it had. Whether the trial court complied with Eddings. I believe that, and I also believe that the Arizona Supreme Court, in theory, could have, even if the trial court had not, done its job under Eddings, I believe that it's clear under U.S. Supreme Court precedent, the Arizona Supreme Court could have corrected that error by saying, well, we find she did. The problem here is, is that in connection with its independent review of this sentence, the Arizona Supreme Court committed an independent error, that if, as a separate body, the three judges that affirmed this sentence, failed to consider mitigating evidence. They said they didn't find it. They said it was refuted. And that's an independent constitutional violation. And I think that we needn't go further than that in order to achieve the relief on that ground. The relief that Mr. Lopez is seeking. I would like to discuss an issue that was not certified in the district court, that Lopez was denied his federally protected constitutional right to counsel when his counsel failed to investigate and present all reasonably available mitigating evidence at sentencing. It was settled by the United States Supreme Court at the time of Petitioner's 1990 capital sentencing, that under prevailing professional norms, Petitioner's counsel was required to conduct sufficient investigation and preparation to present all available mitigating evidence. The federal district court held this issue had not been exhausted in the state court proceedings, and the issue was not certified. We submit that the claim was exhausted, beginning in the state trial court post-conviction relief proceedings and through to the Arizona Supreme Court. The trial judge in the state rule 32 proceedings decided this claim, citing Strickland under the heading, claim that counsel failed to investigate and present certain mitigation. The claim was then appealed to the Arizona Supreme Court through a petition for review, and it was exhausted there. In the brief to the Arizona Supreme Court, Lopez post-conviction relief was presented to the Arizona Supreme Court, and the Arizona Supreme Court's post-conviction counsel cited Strickland v. Washington. She informed the Arizona Supreme Court that Mr. Lopez's lawyer had essentially abandoned him during the sentencing proceedings. She emphasized to the Arizona Supreme Court that the lawyer approached the entire case on the assumption that the death penalty would not be imposed in this case. She argued that the assigned appointed lawyer had turned over mitigation preparation to a unqualified associate in his office, and she informed the court that the trial counsel did nothing to investigate or prepare the lone mental health expert that had been appointed to evaluate Mr. Lopez for purposes of presenting some mitigation. I think that all those things, once they're presented, exhausted the claim, and I believe that the court is now in the process of reviewing the case, and the court should certify the appeal of that exhaustion issue. Let's assume that it was exhausted for the purpose of the question I'm about to ask you. What evidence that was not presented in mitigation could have been presented? Well, the key failing in this case was the failure to do any investigation with respect to Mr. Lopez's background. The key failing was his social background, evidence of abuse in his background. With minimal investigation, both during the state post-conviction proceedings and somewhat more during the federal habeas proceedings, it was discovered that both of Mr. Lopez's parents were severe alcoholics, that they lived in dire poverty throughout his childhood. They lived in a shack with eight of their children, without electricity, that money used for alcohol often left most of the kids without food or proper clothing, that there was a very significant amount of domestic violence in the household, and Mr. Lopez was the second oldest of these eight children, and he took on the responsibility of caring for the babies and the young children in the family, trying to collect them out in the desert when they'd run away from the home during these bouts of frequent domestic violence. None of these things were brought out at the sentencing. They were all discovered with minimal effort. It was discovered after the sentencing that Mr. Lopez himself started drinking at age 12. His educational records were discovered, and it was discovered that at the eighth grade he had barely a degree, and he dropped out of school, not surprisingly, and didn't graduate from high school. I mean, all of that evidence is precisely the kind of evidence that this Court, the United States Supreme Court, has said that counsel has a duty to look for and present, because it goes to not a defense to the crime, but it goes to the moral, what the Supreme Court has called the moral culpability of the case. And, quite frankly, on much more aggravated cases than this, both this Court and the U.S. Supreme Court have said that when a lawyer fails in his or her task to present this very sort of evidence, that that's prejudice, which is, of course, a reasonable probability that at least one juror hearing all this might strike a different balance. And I think that, in my view, is the case. That's precisely what could happen in this case if a fact finder had all this evidence. This evidence regarding Mr. Lopez's background, coupled with everything else that was presented at the original sentencing, you know, taking his life as a whole, and all the things that he had done or tried to do to benefit the community, I think this is a case like in a lot of other cases where this Court has found prejudice. This case is no different. You mentioned that the usual standard is if even one juror might have been influenced. Of course, here we didn't have a jury imposing the sentence. Does that make any difference? Well, this Court has said, I believe in the Summerlin case recently, and perhaps in the Landrigan case, that it will apply the one-juror standard. And having held that, I'm assuming this Court would... Is that because if there were a resentencing, it would have to go to a jury? Well, of course, if this case goes to a resentencing, it will go to a jury. The jury will hear all of this evidence, along with, you know, there's another sort of ineffective assistance claim in this case where the lawyer never really bothered to attack the so-called aggravating evidence. At the sentencing, the State called a doctor, Hobisch, who was a pediatrician who provided some very devastating, aggravating evidence regarding the level of pain that was suffered by the child and the obviousness that the pain would have been to the parents. And nothing was done to investigate that testimony, other than the lawyer interviewed the doctor the day before the hearing. Post-conviction investigation, it was easily discovered through a qualified forensic, a medical examiner in DeKalb County, Georgia, who's a specialist in pediatric forensics, looked at Dr. Hobisch's opinions and said, my gosh, there's no support, no medical or scientific support for anything he's saying. And so, at a resentencing, of course, a jury's going to, I would say, distinguish and will be certainly removed from a lot of the aggravation, which, of course, the Arizona Supreme Court heavily relied on Dr. Hobisch and the trial court heavily relied on Dr. Hobisch at the first sentencing. So, I would like to reserve a little bit of time, if I could. Sure. We'll hear from the Director of Corrections at this time. Your turn. Good afternoon, Your Honor. Before I get into any of the other issues, I want to make it plain that there's something here that's misleading the court. Counsel just got up and said that there was a claim in the second, in the first PCR memo decision by the trial judge, under the heading, claim that, he said, trial counsel, Mr. Bruner failed to investigate the present condition of the patient. And present certain mitigation. And he used that to state that the trial court had considered mitigation, had considered mitigation that the defendant had grown up in a dysfunctional home, that their parents were alcoholics. If you, that's at the very bottom, that's at Helen's opening brief at page 67, and it cites the minute entry. For the, for the PCR decision, it's a petitioner's excerpt of record 455. And that's page 12 of the minute entry. It's at the very bottom, 12 page, page 12 of the minute entry. If you just turn over the page of that minute entry, you'll see that it is referring to the defendant's problem with alcohol. It has nothing to do with the kind of dysfunctional home he was raised in. And also, if you're just talking about the issue of what was raised at the mitigation hearing, and whether his dysfunctional family was discussed at the mitigation hearing, just, if you just read the mitigation hearing, you will see that his father, his mother, his older brother, his older sister, and his younger siblings all testified about his childhood. They were poor. They grew up in a tough environment. They couldn't work when he was a little boy because they couldn't pay the bills, and he had to take care of the parents. Just, if you just read the mitigation hearing, you'll see that there's no substantive basis for that claim at all. I'd like to discuss the Arizona Supreme Court's review of the record, and I'd like to discuss it in conjunction with what the trial court found. The trial court, the defendant argued that the trial court only, the only mitigation evidence that the trial court didn't consider was mitigation evidence that was presented at trial. The defendant didn't present any mitigation at trial, so he was going to proffer any mitigation, and that's what the Supreme Court requires. The Supreme Court requires a capital sentence to be able to consider and give effect to any mitigation evidence proffered by the defendant so as to he might not get the death penalty. That's what the constitutional requirement is from Eddings and Lockett all the way down to Tannard v. Dredke, and this Court knows well as I do, a dozen cases in between at least. That's true, but there are certain types of evidence, both aggravating and mitigating, that have to be presented at trial. For example, the fact that this was done in a heinous manner. You did put on some aggravation evidence, but most of the case I see from Arizona, that is submitted on the basis of trial evidence. Isn't that so? Yes, Your Honor. And in this case, it seems to me that the key element is mens rea. That had to be presented at trial. So what evidence is there in the record, or what do you take from the Arizona Supreme Court decision, having too many California cases recently, that says, shows that the trial court considered mens rea. The trial court. We'll start with the trial court. At the very end of the sentencing proceedings, and in a memo to the trial court prior to the sentencing proceedings, the defense proffered one and only one argument from the trial that showed that there was a lack of intent to kill. In a separate sentencing memo that the court said it read, and at the very end of the sentencing proceeding, the defense counsel went on a long argument about that very issue. The testimony of Anna, the mother, made it clear that there was no intent to kill the child. She had testified that he gave the child CPR after the child had passed out. She had testified that he loved the child. Therefore, the defense counsel argued at great length, I'd say five minutes at least from reading the transcript, that Lopez did not intend to kill the child. After that, the prosecutor was able to make a few statements. The court said, okay, I've considered all this mitigation, and then found, in my view, that he loved the child. He intentionally killed the child. But I think what's a concern of the Arizona Supreme Court concerns me, there's no finding on it, and that is one of the statutory factors under 703G. I think there was a finding, but if the court disagrees, let's... Well, no, I mean, there's no express finding. There's a general finding that there were the, but I didn't see in the record that the trial court made a finding on the injury. How embarrassing to do that in front of an adult court. We've done worse, don't worry about it. And I've seen people do worse, too, so I don't feel that bad. Page 20 of your brief, I think, is maybe what you're looking for. I'll grant you that the issue was raised, and I'll grant you that the trial court said this was a death-qualifying offense under Tyson and so forth. But what I didn't see, and maybe you can correct me, is that there was a consideration of this as a mitigating factor, not death-eligible factor, but as a mitigating factor. Right, the defense lawyer argued that it was a mitigating factor, and the trial court then sentenced him to death immediately, saying that he intentionally, the words were willfully, intentionally abused a child in his care and caused his death. There's no or caused his death or abused a child in his care which resulted in his death. There's just an and in between those two, and I read that as a finding of intent. I've struggled with that sentence. I've parsed it many times and have decided I don't know for sure, because it could be parsed in either of two ways. And the question is whether the willfully and intentionally is meant to modify the phrase that immediately follows or both halves of the balance of the sentence. Exactly, but it would be, I'm sorry, Your Honor. And I've struggled with that, and I look and say, well, what is it, what evidence was there of intent to kill? I'm not saying intent to kill is required as a matter of law. I mean, as my understanding of Arizona law, it's not felony murder. It's sufficient to do the child abuse that puts the victim at risk in that way. But what evidence was there of intent to kill? There's very good evidence, I think. The mother of the child testified that after four days, after the baby died, the defendant told her, blamed her, really, for leaving the child with him. He said that you never should have left the child with me, because something always happens when you do. And as you can tell from my statement of facts, both the state medical examiner and the defense medical pathologist who was hired to review the state's medical expert testimony agreed that the testimony of the state's medical examiner was correct. The baby had been abused, severely beaten on several occasions. And when I mean severely beaten, I mean beaten strongly enough to break ribs, break ribs that had been broken two weeks before, bruise the lung, tear the pancreas in half, aside from doing other significant damage to the organs of the bowel, and fracture the skull in two places with significant enough force to drive the bone into the pancreas. So there were multiple incidents of severe beatings. The state's medical examiner testified that the force that was used on the back of the brain was the kind he sees in car accidents. And those kind of beatings occurred several times. In the PCR proceedings, the defense lawyer said he did an investigation and found that no one else was in a position to do these multiple beatings. Why does that show intent to kill, though, as opposed to generalized, horrible, but generalized child abuse? Well, I think if you generally come close to killing someone, and you finally end up doing it, and you've told someone else that they shouldn't leave that person around them, that's an indication of intent. That's a strong indication of intent. He said, you shouldn't have left me around the baby, it's your fault that this baby's dead. That could just as much suggest he didn't really want to kill the baby, it's your fault for putting me in a position where I could. Absolutely, absolutely, you could not want to do something, but you do it anyway, because of whatever demons are driving you. And that's, you know, you can do first degree murder because you have a real bad state of mind, but it's still intentional killing. What do we make of the statement in the dissent of the Arizona Supreme Court decision which says, that oral argument, the prosecution effectively conceded that there was little or no evidence of intent to kill, and the most probable explanation for the child's death was the defendant became enraged, lost control, and beat the child quite seriously. What I make of it is an appellate lawyer 15 years ago just making a dumb statement. Your Honor, I say that there is clear evidence in the actual trial transcript that shows that there's intent to kill. And I read that trial judge's finding, I don't have it in my brief. I would ask you to read the sentencing, I have part of it in my brief, but I don't have the whole thing in it. I would ask you to read the page before the actual imposition of death. I'd ask you to do that, the judge says, this person had this baby in his care, he was helpless in front of him, his desire to shield himself from punishment led him to make up this story about how a dresser had fallen on the child and injured the child, how he wouldn't take the child to the hospital when the mother asked him to do that, that's certainly an intentional act. And it's not like it's the mother walking in and seeing a baby laying on the floor or on the sofa, not breathing or having difficulty breathing, we're talking about a man who beat the heck out of this child and knew that it was in a state of medical distress and still refused to take it to the hospital when the mom asked at least twice. And if you read the testimony, you'll see that the baby had peritonitis, its stomach was as hot as it was very hot, the mother noticed that it had peritonitis, the baby had also bruising all over the place, Your Honor, I haven't even discussed that yet, it had a very fresh bruise to the chin with a week-old bruise bleeding right into that bruise and a two-week-old bruise bleeding into it from the other side, aside from the hematoma on the back, and aside from ribs multiple times being broken, the same rib, the tenth left rib was broken two or three weeks earlier, it was broken on the day of death and it was bruised, right underneath it was bruised, i.e. was bleeding the lung and that was part of the cause of death, the pathologist said that because of these broken ribs, the child couldn't breathe properly and that was part of the cause of death. Another cause of death was the broken in half pancreas and the bowels that were perforated and ripped from the membrane and the spleen that was bleeding, this caused peritonitis, the medical examiners called it sepsis throughout the body, the defense pathologist thought that was at least a week old, so that also goes to the issue of whether you can get a pathologist seven years after the trial and present it to the Arizona Supreme Court five years after that, if that's going to be something that's going to refute Dr. Hobash's testimony or whether you're just going to get, I won't say laughed out of court because this isn't a laughing matter, but you would have a disaster in court if you brought someone in who said this baby didn't suffer. We're talking about three weeks of successive beatings, sepsis throughout the body. But sepsis doesn't occur in one day. But the intent to kill that day had to be formed, or at least you have to have some formation. What you seem to be arguing, what the prosecution seemed to argue at trial was it's the aggregation of all of these things, these horrible things that happen over a long period of time. That was what the medical examiner concluded, and because the defense pathologist agreed, we don't have the entire defense report, we just have a short part of the defense pathologist report that's attached to a habeas pleading before the district court, only have a couple of lines of it. But what is plain from that is that the defense pathologist believed that the pancreas, which was actually ripped in half, ripped in half, not just torn, but ripped in half. But didn't your witness say that that wouldn't be a cause of death? No, he said it was part of a cumulative cause of death. But if you want, I'll cite you exactly where it was. Well, we can sort that out. You made reference to the accumulation of beatings over time. The evidence presented at trial, you may know or may understand from defense counsel's comments in other contexts, but the criminal offense is what happened that day, not what happened last week or the week before. I respectfully disagree with that and give an example, Your Honor. If I shoot someone on January 1st and I come back and find them in their room still alive and I shoot them again on January 5th and they die, and the testimony from the coroner is that they died of cumulative gunshot wounds on January 10th. January 10th is the day of the murder. But there's no evidence with regard to him being responsible for beatings on a prior date. No, he told the mother that she shouldn't have left him alone with the baby because something, and this is after the baby's dead, something bad or something always happens when she does that and it's her fault. So I think that's as clear as you're going to get unless you expect him to say, yeah, I beat this baby to death, I did it on three separate occasions, breaking his ribs, breaking his spleen and his pancreas and ripping the bowel from the membrane that holds it and breaking all these ribs. Unless you're going to get someone to say that, which you're never going to, unless he wants the death penalty, that's as clear, to me, that's very clear evidence. I'd be happy to go to any jury with that. And that's what happened, of course, the jury did convict him. I just want to bring up, because of all these really serious injuries, and this medical evidence is not only not disputed, it's agreed to by the, we found out from the post-conviction proceedings, the defense pathologists agreed to it. So when I'm saying this is undisputed medical evidence, I'm not saying the state presented it and no one refuted it, I'm saying we know now that it was agreed to. That's what I'm saying. And the pathologist testified, let's see, you never find this when you want it, the pathologist testified that the broken ribs, which are one to three weeks old, caused the child not to be able to breathe for several weeks, the pancreas and the other abdominal injuries caused bleeding and sepsis, and by the way, somewhere in the defense brief is a claim that there was not much subdural hematoma, if any. If this court wants me to provide with graphic evidence, I can tell you there was subdural hematoma all the way around the back of the head, and the medical examiner testified to that. It wasn't just a little bit, and that's right under the skin, and their affidavit, their affidavit that this baby didn't suffer much pain because all your pain receptors are near the skin, well that's right under the skin, and the broken ribs are right under the skin, and on top of that, as this court knows, I'm reading just the first page of the pathologist's testimony, that kid had bruises everywhere, all over his body, up and down his back, in his abdomen, all over his head, and he was also bleeding from the mouth when the police got to the hospital. Do you have some time? Are you free to use it, or not? Sure, I just want to talk about a few other issues. The claim that he had exhausted his, the mitigation, the mitigation issue, that his lawyer was ineffective for presenting the mitigation. His own habeas counsel withdrew that argument in a formal way, the mitigation about him having a bad upbringing. His first habeas counsel, who was a sitting state judge, by the way, in a very formal way, said that the petitioner concedes the above claims, that counsel failed to investigate and present evidence that the petitioner came from a troubled and dysfunctional home, alcoholic parents, that's my comment, that it is possible that the petitioner was sexually abused as a boy. I believe that's been withdrawn. Three, the petitioner had a good record and were not exhausted by post-conviction counsel. To the extent such claims would be grounds for granting relief, petitioner's post-conviction counsel would have been ineffective. That is a very serious claim that one lawyer is making against another. It is not a frivolous claim. And to fully exhaust a claim in the Arizona Supreme Court, per Breeding and a lot of U.S. Supreme Court cases, is that you have to present it to the Arizona courts in a procedurally proper way. This Court's question about whether the claim to the State Supreme Court on Petition for Review that he was abandoned by his client, exhaust that claim, is nonsense. It has to be in a procedurally proper way under Arizona Rule 32.9, and you don't do that by starting at the Arizona Supreme Court. You start at the trial court. Also, the defense cites a couple of U.S. criminal cases. District Court appealed criminal cases. One of them is U.S. v. Tony C. at 343 F. 3rd at 118 Note 2 and 3. Those cases, first of all, have nothing to do with exhaustion. Exhaustion is the cornerstone of habeas relief under AEDPA and the U.S. Supreme Court. It has nothing to do with just simply neglecting to raise a claim in a straight criminal case on a federal appeal. If you look at Note 3 in the C case, it is not talking about forfeiture where you just miss raising a claim because of your own inadvertence and the record is clear anyway and the court can go ahead and consider it sometimes. If you look at Note 3, they're talking about forfeiture, just inadvertence. In this case, there's deliberate waiver, and C itself says that deliberate waiver when you know you have a right and you're foregoing it does not apply even in a federal criminal appeal, and it certainly can't possibly apply to exhaustion in a habeas appeal. Didn't Lopez raise ineffective assistance of counsel in his Rule 32? He raised it, but he didn't raise this. He didn't raise the issue that he had a dysfunctional home. Didn't he raise in the Rule 32 the contention that his counsel was ineffective in not investigating further evidence that could have constituted mitigation? No. Further evidence, no. If we're talking about the issue here, the issue of whether he had a dysfunctional home or he was sexually abused as a boy, which I again think has been withdrawn, no, it was not raised, not at all. It was not raised in the trial court, and his own habeas counsel recognized that. Are we on the same page, Your Honor? I'm sorry. I think we're on the same page, but that's not my understanding. I'm looking at Superior Court docket number 34 and 39, and eventually it was ruled upon on the merits, wasn't it? The court withdrew on the merits, withdrew its merits ruling. If I'm understanding the same claim, are we talking about the Dr. Hobage expert? No. We're talking about the IAC claim based on the failure of trial counsel to conduct an adequate investigation of available mitigation testimony and evidence. Maybe the district court you're talking about. No, I'm talking about this being raised in his Rule 32. The issue, the start of this argument, you said it wasn't exhausted. It's not exhausted. It may have been raised in a sense before the Arizona Supreme Court, but it is not raised in a procedurally proper way. If it was raised in Superior Court in Rule 32 and ruled upon by the Superior Court as a result of it being raised and considered by the Arizona Supreme Court, has it been exhausted? I'm saying it was not raised, it was not answered by the Arizona Supreme Court. As I was saying here, counsel has said that it was the trial court ruled on it in the claim that Mr. Bruner, the trial counsel, failed to investigate and present mitigation. That's plainly false. If you look at the next page there, you'll see that the court is ruling on something else other than these three issues. And finally, I guess I just want to speak a little bit about what is supposedly the Rule 404B issue. Because Arizona law is that when a child is abused regularly and found dead, and that child, it's for children who are four years old or under, typically three. It certainly applies in this case where we have a one-year-old. The Arizona rule is that these children can't speak for themselves. They can't say, Mom, this man's breaking my ribs every week. Can't say that. The Arizona rule is that the medical examiner speaks for them. They get to testify. This kid has been beaten three times in the last three weeks and his ribs have been broken every time. Well, what the expert said was that the injuries were inconsistent with the claim that he understood Lopez had made at some point in talking with police, right? That's exactly right. Okay. That's all. Thank you for your argument. Rebuttal? Every now and then counsel have I guess different views about what's in the record, and that happens. I invite you to read ER 439. Excuse me. Well, it's Carl O'Ryan's testimony. Carl O'Ryan was a lawyer that was appointed in the state post-conviction Rule 32 proceedings to testify with respect to whether trial counsel fell below the standard of care in his investigation for mitigation evidence. And she went on at length. And she said, here's the duty. The duty is you've got to investigate the social background of your client. You've got to prepare your mental health experts. She testified to all that. It's in the record. She then offered into evidence the results of some of her investigation, and she talked about the fact that the parents were alcoholics, that there was a lot dysfunction in the family, that George had started drinking at a young age, that he only had a second-grade reading ability in the eighth grade. She talked about all of that, and that is all in Carl O'Ryan's testimony within the Rule 32 proceedings. So that was raised. Now, in the Respondent's supplemental brief, they noted that the Rule 32 counsel, for whatever reason, didn't plead that in her Rule 32 petition, and that's true. But then she asked the court to raise the issue at an evidentiary hearing. She asked the court to appoint an expert. She asked the court to pay the expert $100 an hour to review all this material and testify, and she did. Then the trial court did make a ruling, and the State notes that in her ruling, after hearing all this evidence about the family dysfunction, in the trial judge's ruling, counsel correctly points out the trial judge only mentioned some evidence that was introduced with respect to Mr. Lopez himself being an alcoholic, and she dismisses that and says that wouldn't have made a difference. Now, when we get back to the district court on that issue, we're going to argue very effectively that that Rule 32 decision was an unreasonable fact-finding under a AEDPA, because the trial court has this slew of new evidence, and she cherry-picks from the State's brief that they submitted, because they submitted proposed findings of fact and conclusions of law, and they said, here, Judge, here's what you need to find on this issue. And she only found a sole fact-finding effect with respect to Mr. Lopez's adult alcoholism, and she ignored all the other evidence that had been presented by Carl Ryan. And so we ---- The case that the other members of his family testified during the penalty phase. Yes, and I wanted to ---- that was my next point. As you find in many of these cases, when the lawyer doesn't do his or her job, the family comes in and they say, yeah, we were happy, we were poor, but we were happy, we didn't have any problems, there was no ---- nobody testified there was any abuse, domestic violence in the home, people, kids running out in the desert to get away from their drunken parents. We were one big happy family, we all loved each other, George was a great brother. That's what ---- when you read the sentencing transcript, it's just the one big happy, but a little bit poor family. None of that evidence about the serious dysfunction and abuse that was going on in that family was ever, ever presented at the sentencing. I guess ---- and I guess I've touched on this a little bit, but this, you know, the question of whether the district court counsel waived this exhaustion issue. It's true that before me, one of the judges or one of the lawyers in the case is now an appellate judge. Mr. Lurch was also involved in the case then. I don't know who, whether it was Mr. Lurch or the other lawyer who made this admission on exhaustion, but I want to dissect this a little bit because it's important. Part of the claim, this claim that the lawyer did not do his job on investigating mitigation, relates to the lawyer's failure to prepare the mental health expert, Dr. Morris. And in the federal petition and in the traverse, the lawyers very clearly argued that claim had been exhausted. And that, of course, is part of the very claim that we're addressing, which is that, and that's addressed in the lawyer's petition to review to the Arizona Supreme Court when she says, the lawyer didn't prepare Dr. Morris. So that, you know, that line of our claim has been exhausted throughout. The lawyer did say that the family, for reasons that I certainly can't understand, the lawyers also said that they thought that at least the piece of this claim regarding the family dysfunction may not have been exhausted. But I think that was clearly a mistake, and I think that this court, when it has a clear record of the facts, I think that under this court's cases, it can elect to decide that issue, even though it was a mistake made by district court counsel. Thank you. I want to just talk a little bit about the intent to kill. I mean, we don't want to retry the murder case here today. That's not really what we're here for. We're talking about really the sentence that the Arizona Supreme Court affirmed and the death penalty sentence, not whether, on these facts, Mr. Lopez was guilty of felony murder, child abuse. And the court asked some questions about this intent to kill and asked, well, did the appellate lawyer appear before the Arizona Supreme Court and say, I have no idea what intent was, and that's certainly what happened. But that's not all that happened. I mean, the court did try when everybody said, we don't know. Well, they don't have to prove. Well, and they didn't. That's absolutely true. They never argued. So did the jury, which is only dealing with guilt and didn't even have a separate penalty phase. I mean, I can understand the lawyer arguing that. But for the judge who's doing the sentencing, I mean, that's the point of the mitigation case. If you lack the intent to kill, you may be guilty of the crime, but that's an element of mitigation. Was there enough there for the judge to be able to say, I think he intended to kill? You know, there was no evidence presented. It's a very circumstantial case. You know, there was a lot of evidence in this record that we have before us. Let me change the question slightly. Suppose there was an explicit finding, intent to kill. Presumably, you'd be arguing under the EFTA standard that that's an unreasonable finding. What would you point to as to why that finding doesn't make sense? I'm sorry, Your Honor. I mean, let's assume for the moment, hypothetical. Suppose this sentence that I've had difficulty parsing was explicit. Suppose the trial court judge had said, I conclude that defendant intended to cause the death of his child, knowingly cause the death of his child. Both of the terms short of reckless, which you accurately argue is on the other side of the line. Would you be arguing to us that that's an unreasonable conclusion or an unreasonable finding of fact? And if so, based on what? What is it that weighs against the finding? I think that that would be an unsuccessful argument. I think that under AEDPA, it would be extremely difficult to argue that that would be an objectively unreasonable finding. And one hates to make concessions when they're thinking for only a few seconds. But I think that that would be a very difficult argument. Now, let's throw that standard out. Let's just say you're making the pitch to the trial judge. Is there something you would point to to affirmatively demonstrate a lack of intent? What I would have argued, number one, people with George and this child said he loved this child. And when he learned the child died, he grieved for this child. And a whole bunch of witnesses had concerns that this child's mother was abusing and neglecting him. And, you know, we don't know, nobody knows who inflicted these injuries that counsel was talking about on these other occasions. The mother always said, I never saw any bruising. You know, when the pathologist testified that this child had bruising that would have been evident the day prior or a week prior, the mother told the police, I never saw any of that bruising. And we have witness statements in the record that pertain to this one occasion when Mr. Lopez came to the babysitter's house. And this baby had two black eyes. And George walked in, the witness says, and looks at this baby and says, and his wife, Anna was there, the mother, and said, what happened? And the witness said, well, she sort of squirmed around a little bit and she said, oh, you know George. And the witness says, George just sort of shrugged his shoulders and went like this, didn't know what happened. So, you know, there's a lot of arguments that could be made if this case had to be retried. But I think that I'll end where I started, and that is with an invitation that this Court looked very carefully at the Arizona Supreme Court's opinion, which made certain findings that simply don't hold up, and on that basis award Mr. Lopez the writ of habeas corpus that he sought so that he can have a sentencing before a jury. Thank you.
judges: Hawkins, Thomas, Clifton